**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1069**

CHARLES J. ELLEDGE,

      Plaintiff – Appellant,

v.

LOWE'S HOME CENTERS, LLC,

      Defendant – Appellee,

and

LOWE'S COMPANIES, INC.

      Defendant.

------------------------------

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; DISABILITY RIGHTS NORTH CAROLINA; PROTECTION AND ADVOCACY FOR PEOPLE WITH DISABILITIES, INC.; DISABILITY LAW CENTER FOR VIRGINIA; DISABILITY RIGHTS OF WEST VIRGINIA; DISABILITY RIGHTS MARYLAND; NATIONAL DISABILITY RIGHTS NETWORK,

      Amici Supporting Appellant,

RETAIL LITIGATION CENTER, INC.; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

      Amici Supporting Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Statesville. Robert J. Conrad, Jr., District Judge. (5:16-cv-00227-RJC-DCK)

———————

Submitted: September 11, 2020                    Decided: November 18, 2020

———————

Before GREGORY, Chief Judge, and WILKINSON and NIEMEYER, Circuit Judges.

———————

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Gregory and Judge Niemeyer joined.

———————

Robert M. Elliot, Winston-Salem, North Carolina, R. Michael Elliot, ELLIOT MORGAN PARSONAGE, Charlotte, North Carolina, for Appellant. James M. Powell, Greensboro, North Carolina, Theresa M. Sprain, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellee. Deborah R. White, RETAIL LITIGATION CENTER, INC., Arlington, Virginia; Matthew A. Fitzgerald, Richmond, Virginia, Amy Morrissey Turk, MCGUIREWOODS LLP, Norfolk, Virginia; Daryl Joseffer, Jonathan Urick, U.S. CHAMBER LITIGATION CENTER, Washington, D.C., for Amici Curiae.

WILKINSON, Circuit Judge:

In the aftermath of knee surgery, Chuck Elledge parted ways with his long-term employer Lowe's Home Center. The separation was not amicable. Soon thereafter, Elledge sued Lowe's for violation of the Americans with Disabilities Act (ADA), claiming that Lowe's had forced him out of his director-level job even though, with reasonable accommodations, he could still perform its essential functions. He also claimed that Lowe's violated the ADA when it refused to reassign him to another director-level position. Finally, Elledge alleged discrimination under the Age Discrimination in Employment Act (ADEA). The district court granted summary judgment to Lowe's on Elledge's claims. For the following reasons, we affirm.

## I.

Chuck Elledge worked for Lowe's for over two decades. In 1993, Elledge accepted employment as a health care analyst at Lowe's Home Center. He earned multiple promotions over the years, ultimately attaining the position of Market Director of Stores (MDS). In this position, Elledge oversaw a dozen stores. He ensured that his stores complied with corporate quality standards and, of course, that they continued to turn a healthy profit. Elledge served as an MDS for almost a decade, and the stores under his supervision performed well.

Elledge also had problems with his right knee. In December 2014, he underwent the most serious of four surgeries on his knee. When he returned from leave, once effortless aspects of his job had become trials in "working through the pain." J.A. 1993. Walking

3

the floors of the stores he supervised had become trying at times, and driving from store to store could be taxing.

Given the demands of his station, these changes in Elledge's condition were significant. For Elledge and for Lowe's, the store visits were essential to maintaining high levels of compliance and performance. To keep pace with the needs of his stores, Elledge had typically conducted two separate store visits each day and worked between fifty and sixty hours each week, with the considerable walking and driving that entailed.

Upon his return to work, Elledge's doctor ordered him to restrict his walking to no more than four hours each day and his workday to no more than eight. Lowe's, in consultation with Elledge, agreed that, for a time, he could and should abide by his doctor's orders while he continued to work. Lowe's also offered Elledge the use of a motorized scooter to ease the strain on his knee during store visits. Elledge declined the use of the motorized scooter and, although he did comply with his light-work schedule most of the time, he did not always find himself able to follow his doctor's orders. Elledge arranged for his lower-ranking colleagues, who had previously only accompanied Elledge on his store visits, to drive him to and from the stores under his supervision, so that Elledge would have an opportunity to stretch out his knee in the back seat.

Shortly after renewing these accommodations, Lowe's learned that Elledge would be issued a permanent disabled parking permit. Contacting Elledge's doctor, Lowe's inquired whether Elledge's restrictions would be permanent. The doctor replied in the affirmative: "I rec these be permanent restrictions." J.A. 1929.

4

In response to this development, Lowe's Regional Human Resources Director Hollie Reinhart and Vice President of Store Operations Delno Dryden had several conversations with Elledge. The purpose of these conversations was to chart a mutually agreeable course forward. Although Elledge would not be able to remain in his present position, Reinhart and Dryden spoke with him about other potential career opportunities at Lowe's, agreeing to network on his behalf regarding any vacancy in which he had an interest or, in the alternative, to help shift him to a less physically demanding manager-level role.

Displeased at the prospect of stepping down into a lower paying position, Elledge applied to two other director-level positions, Merchandising Director of Lawn and Garden and Merchandising Director of Outdoor Power Equipment. His applications were considered and rejected under Lowe's succession planning and best-qualified hiring policies. Ryan Lane, who had been identified through the Lawn and Garden department's succession planning policy, was selected for the former position. Chad Sanders, who had founded Lowe's Assistant Store Manager Leadership Development Program and directed Lowe's Leadership Development Sessions for the National Sales Meetings, was selected for the latter. Elledge, meanwhile, accepted Lowe's offer of a severance package and early retirement.

The matter, however, did not rest there. Elledge sued his former employer for violation of the Americans with Disabilities Act and the Age Discrimination in Employment Act. He argued that Lowe's had violated its obligations under the ADA by removing him from the MDS role and by refusing to reassign him to either of the

5

aforementioned positions. He also argued that its rejection of his applications constituted illegal age discrimination under the ADEA. The district court granted summary judgment to Lowe's on both claims, finding in relevant part that Elledge had failed to show he was a "fully qualified" individual under the ADA, who could perform the "essential functions" of his job "with or without reasonable accommodation." J.A. 2325–27. The district court also found that Elledge had not shown that he was qualified for the jobs to which he had applied, a contention necessary to his claims under both laws. Elledge appealed.

As Elledge's appeal is from summary judgment, this court reviews the district court's findings *de novo*, drawing all reasonable inferences from the record in Elledge's favor. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150–51 (2000); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 565 n.1 (4th Cir. 2015).

II.

The ADA provides that "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees . . . ." 42 U.S.C. § 12112(a). In order to count as a "qualified individual" entitled to the ADA's protections, a person must be able "with or without reasonable accommodation [to] perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The parties dispute whether Elledge satisfies this definition: Elledge argues that, given reasonable accommodation, he was capable of performing his job's essential functions; Lowe's denies the same.

6

The beginning of this inquiry lies, accordingly, with a determination of just what the essential functions of Elledge's MDS position were. A function is essential as long as it "bears more than a marginal relationship to the job at issue." *Rohan v. Network Presentations LLC*, 375 F.3d 266, 279 (4th Cir. 2004) (quoting *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994)); *see also* 29 C.F.R. § 1630(n)(1) (defining an "essential function" as a "fundamental job dut[y]"). The ADA further provides that, in any determination of a position's essential functions, "consideration shall be given to the employer's judgment." 42 U.S.C. § 12111(8).

That makes sense. The employer's business judgment—that is, the judgment of the entity that defined the employee's role in the first place—commences the analysis. As is attested in the law of other circuits, the decision about a position's essential functions belongs, in the first instance, to the employer; it accordingly merits "considerable deference" from the courts. *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998); *see also Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998).

While the ADA identifies a position's written job description as relevant to the employer's judgment on this question, 42 U.S.C. § 12111(8), it does not posit that description as dispositive. Rather, a court performing the essential functions inquiry must consult the full range of evidence bearing on the employer's judgment, including the testimony of senior officials and those familiar with the daily requirements of the job. *See, e.g.*, *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005); *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 120–21 (2d Cir. 2004); *Stephenson v. Pfizer, Inc. Eyeglasses*, 641 F. App'x 214, 216 n.4 (4th Cir. 2016).

A.

With our consideration of the record thus informed, there is no reason to doubt the district court's conclusion that the essential functions of the MDS position included: (1) standing or walking in excess of 4 hours each day; (2) travelling to all supervised stores; and (3) working in excess of 8 hour each day. J.A. 2323–25.

Because the first two of these essential functions relate to the MDS's personal mobility, they will be treated together. Their importance is attested, first and foremost, by the official MDS job description. It states that a candidate for MDS must be capable of walking "frequent[ly]," defined as "34%–66%" of working hours, and driving "continuous[ly]," defined as "67%–100%" of working hours. These requirements mean that an MDS must possess the mobility and stamina to handle days in which his job requires him to walk 66% of the time, as well as those days in which he must drive almost without ceasing.

As a matter of plain meaning, then, Elledge's contention that the job's true mobility-related requirements are determined only by the bottom figure of the listed ranges is mistaken. In a requirements context, "between" betokens a fully inclusive range: a worker whose strength allows him to lift a maximum of 75 pounds is unfit for a job that requires workers to be able to lift loads weighing between 50 and 100 pounds.

Moreover, evidence whose soundness Elledge admits resolves any ambiguity in Lowe's favor. Elledge himself testified that coaching store managers in person, maintaining visibility and accessibility *vis-a-vis* store managers and other employees, and conducting store-walks to maintain quality standards were integral to success in the MDS

8

role. But because the MDS bears responsibility for multiple stores —no fewer than twelve in Elledge's case—none of these activities is possible without significant amounts of driving and walking. Elledge testified, for example, that he usually spent between three and four hours on each store visit and, in a normal week, conducted two such visits every day. Each of these visits required, on average, between two and three hours walking the floors.

The uncontradicted testimony of Elledge's supervisor, Delno Dryden, is that such an experience was typical among MDSs. MDSs could take between four and five hours to conduct a visit of a single store, and they usually visited two stores each day. Even granting all reasonable inferences in Elledge's favor, then, the conclusion that the walking and driving functions discussed above were essential to Elledge's position is, in the face of such a record, beyond any reasonable finding to the contrary.

The same is true of the need for an MDS to be able to work in excess of eight hours each day—like the mobility-related requirements just discussed, it was an essential function of the job. Because a written description is not exhaustive of an employer's judgment as to the essential functions of a position, the silence of the official MDS job description as to an hours requirement cannot be dispositive for either side. Especially in the absence of an explicitly stated standard, what matters is testimony about the day-to-day regimen of the job. *See Rodal*, 369 F.3d at 120–21.

And here, the tale the record tells is beyond genuine dispute. Elledge himself acknowledged that, prior to his surgery, he typically worked between fifty and sixty hours per week. The uncontroverted testimony of other senior Lowe's officials confirms that a

workweek of fifty hours or more was the norm, rather than the exception, for MDSs. It is likewise telling that Lowe's extended the forty-hour workweek to Elledge *as an accommodation*, rather than as an adjustment Elledge could simply make at his discretion. For a high-level directorship position whose responsibilities center upon maintaining close contact with numerous stores, their managers, and their hourly workers, the uncontested expectation of a lengthy workweek is entirely unsurprising. On this record, no reasonable jury could find that working over eight hours each day was anything less than an essential function of the MDS position.

B.

The threshold question, then—whether walking, driving, and working in the amounts just described "bear[] more than a marginal relationship to the job at issue," *Rohan*, 375 F.3d at 279 (quoting *Tyndall*, 31 F.3d at 213)—must be answered in the affirmative. Next we must determine whether Elledge is a "qualified individual" under the ADA, that is whether he was able to perform these essential functions "with or without reasonable accommodation." 42 U.S.C. § 12111(8).

That Elledge could not perform the essential functions of his job without reasonable accommodation is not open to serious dispute. The orders of Elledge's physician established his limitations without qualification: he was to walk no more than four hours and work no more than eight hours each day. Because of these restrictions, Elledge needed, requested, and received accommodations that would allow him to deviate from the standard requirements of his job.

10

## C.

Thus the final question: could Elledge perform the essential functions of his job "with . . . reasonable accommodation"?  The answer depends, of course, on what counts as a "reasonable accommodation" under the ADA.

We start with the text. The ADA defines "reasonable accommodation" as one that "*may* include job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies . . . *and other similar accommodations . . . .*" 42 U.S.C. § 12111(9) (emphases added).  As the emphasized language makes clear, the ADA defines "reasonable accommodation" in a way that is illustrative rather than exhaustive.  The purpose of such language is to indicate that the range of reasonable accommodations is broad and that its contours are clarified by, but not limited to, the specifically enumerated items. *See EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1345 & 1345 n.5 (11th Cir. 2016).  It is also to suggest that what counts as a reasonable accommodation is not an *a priori* matter but one that is sensitive to the particular circumstances of the case. *See id.*  And finally, the text teaches that what will serve as a reasonable accommodation in a particular situation may not have a single solution, but rather, many possible solutions.

The actor responsible in the first instance for reducing this wide solution-space to a concrete accommodation is not the judiciary, or even the disabled employee—it is the employer.  To the extent an employee may be accommodated through a variety of measures, the employer, exercising sound judgment, possesses "ultimate discretion" over

11

these alternatives. 29 C.F.R. app. § 1630. Such is the established position of this circuit, *Reyazuddin v. Montgomery County Maryland*, 789 F.3d 407, 415–16 (4th Cir. 2015), as well as that of every other circuit that has ruled on the matter, *see e.g.*, *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800–01 (6th Cir. 1996); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1137 (8th Cir. 1999) (en banc). Provided the employer's choice of accommodation is "reasonable," 42 U.S.C. § 12111(8), not even a well-intentioned court may substitute its own judgment for the employer's choice.

Elledge contends that, at the time he learned that he could no longer remain in the MDS position, he was able to perform the essential functions of his job with the accommodations that Lowe's had already provided him. As noted above, the accommodations formally offered and accepted through Lowe's Interactive Process Forms included: (1) allowing Elledge to operate on a light-work schedule (*i.e.*, walking limited to four hours per day and work limited to eight hours per day); and (2) offering Elledge use of a motorized scooter for his in-store visits. Elledge argues that these accommodations allowed him to perform the *truly* essential functions of his job, because during the relevant period the stores under his care continued to flourish.

We are not persuaded. To begin with, Elledge did not take advantage of his light-work accommodation—that is, he did not comply with his doctor's orders—with total consistency. His own estimate was that he flouted his light-duty restrictions about 25% of the time. Furthermore, despite accepting the offer on paper, Elledge steadfastly refused even to try using a motorized scooter to aid his store walk-throughs. In spite of his pain, Elledge insisted that he "didn't need one then. . . and [he] would have never asked for one."

12

J.A. 1926. Finally, without receiving formal clearance through interactive process, Elledge crafted his own sort of accommodation: he made an arrangement with the associates who usually accompanied him on his store visits, whereby they would drive him back and forth, so as to ease the strain on his knee.

The point of cataloguing these lapses and irregularities is not to impugn Elledge. It is simply to say that even the version of the record most favorable to Elledge does not tell the story of a disabled employee who followed his doctor's orders regularly or utilized his accommodations fully. Instead, it tells the story of an individual who accepted or created certain accommodations, rejected others, and pushed himself beyond the limits of his doctor's orders. Under these circumstances, we cannot find that the claimed success of his stores proved his ability to perform the essential functions of his job, given the reasonable accommodations Lowe's had extended to him. *See E.E.O.C. v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 595 (4th Cir. 2015) (per curiam). In fact, his manifest need to disregard his physician as well as to seek informal accommodation outside the interactive process created a situation that Lowe's could reasonably assume had limited long-term potential.

Given the essential functions of his job—to be able to walk 66% of the day, to be able to transport himself to and from his stores, and to be able to work over forty hours each week—no reasonable accommodation could, ultimately, have sufficed. But this was not for want of trying, or hoping, on both sides. Lowe's acted reasonably to accommodate Elledge's transition from a debilitating surgery back to full employment. Lowe's extended the aforementioned accommodations on a temporary basis, in anticipation of Elledge

13

making a full recovery. When sixty days after Elledge returned to work, his condition had not improved and his doctor's restrictions had not loosened, Lowe's did not give up on Elledge—it granted him another temporary extension of the same accommodations.

But over the relevant period, Elledge's condition never substantially improved, and his doctor's orders continued to fall short of what was required for Elledge to perform the essential functions of his job. Part-way through the extension period, Lowe's contacted Elledge's doctor—the professional most knowledgeable about Elledge's medical condition—about Elledge's prospects for recovery. The doctor responded, "I rec these be permanent restrictions." Elledge complains that Lowe's reacted too hastily to ambiguous correspondence. But Lowe's interpretation, that Elledge's long-term physician was referring to the light-duty restrictions he had been recommending for months, was a reasonable one. *See Adams v. Anne Arundel County Public Schools*, 789 F.3d 422, 432 (4th Cir. 2015) (emphasizing the weight of doctors' professional judgment). Especially after Elledge's four separate knee surgeries in almost as many years, Lowe's was also reasonable in concluding, on the basis of this new information, that the light-duty accommodation was no longer viable. With no tangible signs of improvement, Lowe's could not have been expected to extend such a dramatic reduction in its work requirement indefinitely. Elledge himself had not requested a permanent light duty accommodation.

As to Lowe's other accommodations, use of a motorized scooter was an eminently reasonable one that could have augmented Elledge's on-the-ground mobility. But this path to fulfilling one of the job's essential functions was foreclosed by Elledge himself. At any time during the accommodations period, he could have availed himself of an in-store

14

scooter and at least tried it out. He did not, and he had no intention of ever doing so. In practice, then, Elledge rejected this accommodation. Lowe's, possessing "ultimate discretion" over the choice among reasonable accommodations, was not—in the face of Elledge's rejections of such an obvious and helpful offer—required to extend another. *See Reyazuddin*, 789 F.3d at 415–16 (4th Cir. 2015) ("an employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested"); *see also Hankins v. The Gap, Inc.*, 84 F.3d at 800–01; *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998).

As for the possibility of formalizing Elledge's arrangement to have another employee drive him to his stores, this court is not empowered to compel Lowe's to recognize such a course as reasonable. Although employers must provide reasonable accommodation to assist disabled employees in performing the essential functions of their jobs, employers do not need to change a job's essential functions or split them across multiple employees. 29 C.F.R. app. § 1630.2(o); *see also Shin v. Univ. of Md. Med. System Corp.*, 369 Fed. Appx. 472, 482 (4th Cir. 2010); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir.1995) (finding ADA does not mandate accommodations that would require other employees to work "harder or longer"). If Elledge could not drive himself, but rather had to arrange for other employees to drive him, it is difficult to see just how Lowe's could have reasonably accommodated him in performing that essential function.

In the end, Lowe's made reasonable, sensitive attempts to accommodate an indisputably valued employee in his present position. And yet, between the fixity of Elledge's mobility-related restrictions and his refusal to accept the motorized scooter

15

accommodation, Lowe's determination that he could no longer remain in the highly demanding MDS position was reasonable. Even drawing all reasonable inferences in favor of Elledge, it remains that no reasonable accommodation, consistent with Elledge's doctor's orders, would have allowed him to perform his job's essential functions.

## III.

Elledge argues nevertheless that even if he could not have been reasonably accommodated as an MDS, Lowe's violated his rights under the ADA by failing to reassign him to another vacant and comparable position. In particular, Elledge identifies two such positions: Merchandising Director of Lawn and Garden; and Merchandising Director of Outdoor Power Equipment.

## A.

Claims for reassignment under the ADA must be handled with care because of reassignment's unique status under the law. Although "reassignment to a vacant position" appears in the middle of 42 U.S.C. § 12111(9)'s undifferentiated list of possible accommodations, other circuits, as well as the interpretive guidance of the EEOC, persuasively recognize reassignment as an accommodation of "last resort." EEOC, *Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA* (2002); *see e.g.*, *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1301 (D.C. Cir. 1998) (citing H.R. Rep. No. 485(II), 101st Cong., 2d Sess. at 63 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 345; S. Rep. No. 116, 101st Cong., 1st Sess. at 6 (1989)); *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 484 (8th Cir. 2007) (citing *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1019 (8th Cir. 2000)).

16

Reassignment's "last among equals" status is not only clearly attested in the legal landscape; it also respects core values underlying the ADA and employment law more generally. It recognizes that basic fairness in such a context rests atop an often-rickety three-legged stool, whose legs are the employer, the disabled employee, and—easiest to neglect—the other employees. First, consider the employer. Allowing other reasonable forms of accommodation to take precedence over reassignment protects the employer's discretion over hiring. This discretion is what makes it possible for the employer to discharge its responsibility to promote workplace stability as its workforce changes over time, and—to the extent appropriate—to reward merit through predictable advancement. Such discretion is also fundamental to the employer's freedom to run its business in an economically viable way. *See EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1346 (11th Cir. 2016).

The disabled employee also benefits. Although an employer *may* accommodate through reassignment at any point, reassignment's last-resort status encourages employers to take reasonable measures to accommodate their disabled employees in the positions they already hold. The employee is thereby saved from being hurled into an unfamiliar position with a different set of demands; instead, he is allowed to maintain and to grow the investment he has already made in his present job.

Finally, deemphasizing reassignment helps preserve a fair balance in the relationship between a disabled employee and his colleagues. Reassignment is unique in its potential to disrupt the settled expectations of other employees, so much so that no employer is required to reassign where reassignment would "bump" another employee

from his position, *Aka*, 156 F.3d at 1305; *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 355 (4th Cir. 2001), or block reasonable, long-time workplace expectations. Holding reassignment in reserve for unusual circumstances bolsters the confidence of other employees that the misfortune of a colleague will not unfairly deprive them of opportunities for which they themselves have labored. *See U.S. Airways v. Barnett*, 535 U.S. 391, 404–05 (2002). In this way, not only fairness, but also workplace comity and morale are well-served.

B.

The Supreme Court in *U.S. Airways v. Barnett* has given further guidance on a disabled employee's right to receive reassignment under the ADA. In *Barnett*, a disabled employee who could not be accommodated in his present position, claimed a legal right to reassignment to a mailroom position, even though reassignment to said position would have contravened his employer's long-standing, seniority-based hiring system. The Court held that "a plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an accommodation seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Barnett* 535 U.S. at 401 (internal quotations omitted). Under this rule, it denied the employee's claim, finding that an employer's disability-neutral, seniority-based hiring system presumptively trumped the employee's otherwise reasonable request for reassignment. *Barnett*, 535 U.S. at 394.

Elledge argues that his claim for reassignment not only survives *Barnett*, but that *Barnett* actually requires it. To do so, Elledge reads *Barnett* as articulating an almost *sui generis* exception—the well-entrenched, seniority-based hiring system—to a general ADA

norm requiring reassignment where no other reasonable accommodation is possible. Lowe's best-qualified hiring system, not at all fitting within this niche exception, could not, says Elledge, have insulated it from its statutory mandate to reassign him to either of the vacant positions he had identified.

This reading, however, disconnects *Barnett*'s holding from its reasoning. It recasts the ADA—a shield meant to guard disabled employees from unjust discrimination—into a sword that may be used to upend entirely reasonable, disability-neutral hiring policies and the equally reasonable expectations of other workers. But *Barnett*'s holding must be understood in light of the principles undergirding it.

The first principle is *Barnett*'s articulation of the end, or purpose, of the ADA, which is naturally read to express some limit on what is required under the ADA's reasonable accommodation provision. The end of the ADA is equality of opportunity for disabled employees. *Barnett*, 535 U.S. at 397. But that does not in turn mean the end of all preferences for the disabled. "[P]references will sometimes prove necessary," the Court announced, "to achieve the Act's basic equal opportunity goal. The Act requires preferences . . . that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy." *Id.* (emphasis in original). Stated otherwise, *Barnett* does not require employers to construct preferential accommodations that maximize workplace opportunities for their disabled employees. It does require, however, that preferential treatment be extended as necessary to provide them with the *same* opportunities as their non-disabled colleagues. *Id.*; *see also*, *St. Joseph's Hospital*, 842 F.3d at 1346–47; *Huber*, 486 F.3d at 483.

19

The other key principle is the value of stability in employee expectations—the third leg of the stool mentioned above—which the Court invoked as the "most important" reason justifying the precedence of the employer's seniority-based system over the disabled employee's otherwise valid right to reassignment. *Barnett*, 535 U.S. at 404–05. The Court accordingly refused to compel the "substitut[ion of] a complex case-specific 'accommodation' decision made by management for the more uniform, impersonal operation of seniority rules," thereby undermining "employees' expectations of consistent, uniform treatment." *Id.* Such interests are to be jealously guarded insofar as they represent employees' personally costly investments in their own careers.

Just as these principles jointly justified the Court in upholding the integrity of the seniority-based hiring system at issue in *Barnett*, they justify upholding the integrity of Lowe's practices as well. Lowe's advanced its employees in accordance with a special kind of best-qualified hiring system. As a way of consistently identifying and promoting internal talent, Lowe's merit-based approach examined an employee's record of experience and qualifications as well as, for an employee advanced to the next round in the hiring process, his performance in interview settings. For many of its senior-level positions, Lowe's nested within this merit-based system an "Enterprise Succession Management Process." This process represented Lowe's continuous effort to identify talent intra-departmentally and, by providing special training and attention, to prime its most competent employees for promotion into the heightened responsibilities of the department's director-level positions. This system is, on its face, disability neutral. It invites, rewards, and protects the formation of settled expectations regarding hiring

20

decisions. And most importantly, it is a reasonable, orderly, and fundamentally fair way of directing employee advancement within the company. In the ordinary "run of cases," reassignment in contravention of such a policy would not be reasonable.

Nor should this result surprise. In *Huber v. Wal-Mart Stores, Inc*, the Eighth Circuit found that Wal-Mart's best-qualified hiring system fell under the same principles as the seniority-based system in *Barnett*, and consequently denied reassignment. 486 F.3d at 483–84. Parallel reasoning grounded the same result for the best-qualified system at issue in *EEOC v. St. Joseph's Hospital* ("[r]equiring reassignment in violation of an employer's best-qualified hiring or transfer policy is not reasonable in the run of cases."). 842 F.3d at 1346–47. The hiring policy at issue here, which builds a succession system within a best-qualified system, falls even more squarely within the ambit of *Barnett*.

## C.

Elledge claims that such a holding would deprive him of the equality of opportunity *Barnett* and the ADA guarantee. But the record demonstrates that Lowe's extended reasonable accommodations to Elledge, acting at every stage to ensure that his disability did not unfairly compromise his equality of opportunity at Lowe's. The light-duty accommodation provided a reasonable pace and period, given the strenuous demands of the job, for Elledge to recover from his surgery. Lowe's offer of a motorized scooter was reasonably calculated to mitigate the disadvantages of Elledge's reduction in natural mobility. The significance of these accommodations, having been extensively discussed above, will not be dwelt upon further here.

21

What must be added is that Lowe's also reasonably accommodated Elledge by directly assisting him with job transition. Reinhart and Dryden, a Director of Human Resources and a Vice President of Store Operations respectively, had several conversations with Elledge about alternative career opportunities at Lowe's. They also agreed to network on his behalf regarding any and all positions in which he might express an interest. Reinhart and Dryden were senior-level employees; their time was valuable to Lowe's but they rightly devoted a non-trivial portion of it to help Elledge identify and approach new opportunities at the company. When Elledge did submit his applications to the Merchandising Director of Lawn and Garden and Managing Director of Outdoor Power Equipment positions, he did so through the same process as every other employee. The face of the record, then, shows many examples of Lowe's proactively working to ensure that Elledge did not, despite his disability, receive anything less than "the same workplace opportunities" as other, non-disabled employees. *Barnett*, 535 U.S at 397.[1]

Elledge, however, claims that his applications were disadvantaged on account of his disability, proven indirectly by his losing both positions to men of inferior qualification. But again, even drawing the reasonable inferences in Elledge's favor, this claim is without a sound basis in the record.

For purposes of the present appeal, both positions share the same relevant qualifications, which include: (1) four years of experience in retail merchandising; (2)

---

[1] The accommodations listed in this and the prior paragraph should suffice to lay to rest Elledge's claim that Lowe's failed to act in good faith or to provide Elledge with an adequate degree of interactive process.

experience working within the relevant category; (3) negotiating with vendors; (4) overseeing "Product Line Review," which requires evaluation of vendors and of product-line performance; and (5) identifying and driving new product opportunities. Taken together, these qualifications indicate the importance of possessing a deep practical understanding of the relevant product category.

For the Lawn and Garden directorship, Elledge points to the handful of isolated experiences with lawn and garden that he accumulated over the course of his almost two decades at Lowes. But these do not support an inference that Elledge's application was disadvantaged because of his disability. Ryan Lane, who ultimately received the offer, had been identified as a prime candidate for that position through the Lawn & Garden department's succession planning system, which means that Lowe's had recognized his product-area potential and invested in training him specifically to fill future vacancies in that department's directorships. That was in keeping with the company's policy and the incentives and expectations fostered by intra-departmental advancement.

As for the Outdoor Power Equipment directorship, Elledge's alleged experience in the relevant product category was even less robust. He provided little evidence of direct experience in merchandising, evaluating, or negotiating over products in the outdoor power equipment line. Chad Sanders, whom Lowe's ultimately hired for the position, did not possess significantly more experience with outdoor power equipment than Elledge, but he did surpass Elledge in other relevant respects. Namely, he was the founder of Lowe's Assistant Leadership Development program and directed leadership development at the company for over five years. Again, given this disparity between the two applicants in an

23

area so central to a directorship position, it is not reasonable to infer that Lowe's deprived Elledge of an equal opportunity to compete for the position because of his disability. The reasonable inference is, instead, that Lowe's, in a perfectly legitimate exercise of its discretion, found that Sanders' unique strengths and experiences better qualified him to serve in that position at the time the hiring decision was made. *See St. Joseph's Hosp.*, 842 F.3d at 1346 n.5.

It is also worth noting here that Reinhart and Dryden informed Elledge about and encouraged him to accept a manager-level role. These positions would not be as well remunerated as Managing Director of Stores, but their responsibilities would be lighter and the jobs themselves easier to obtain. Such a position could have served as a track for Elledge to gain new and valuable experience that would return him to the directorship level, this time in a position more suited to his condition. Elledge declined because of the prospective reduction in compensation, which was, of course, his prerogative. But it cannot be said that Lowe's shunted Elledge off to an early retirement without attempting to provide him meaningful opportunities to continue his working relationship with the company.

We do not write broadly. On the facts and record before this court, however, Elledge simply cannot claim that Lowe's was an employer indifferent to the requirements of the ADA. To the contrary, the company met at multiple turns the statute's core obligation of providing reasonable accommodation to the employee, and we thus affirm the trial court's ruling.

24

IV.

Elledge claims that Lowe's removal of him from the MDS position and its rejection of his job applications violated the ADEA. In order to prove a *prima facie* case that a removal violated the ADEA, Elledge must show *inter alia* that he was qualified for his job. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). As the foregoing demonstrates, however, Elledge was not able to perform the essential functions of his MDS job with or without reasonable accommodations. This inability bars his *prima facie* case on removal.

Making a *prima facie* case that an unfavorable hiring decision offended the ADEA requires a similar showing, namely that "the position . . . was filled by a similarly qualified applicant who was substantially younger than the plaintiff." *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006). For the reasons noted in the preceding section, Elledge's competitors each possessed certain unique qualifications that Elledge lacked, qualifications it was not at all pretextual or discriminatory for Lowe's to weigh in filling the positions at issue.

V.

For the foregoing reasons, we shall affirm the judgment of the district court.

*AFFIRMED*