**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 24-1010**

───────────────

DEANNE M. HALL HAGGINS,

        Plaintiff – Appellant,

v.

WILSON AIR CENTER, LLC,

        Defendant – Appellee.

───────────────

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., District Judge.  (3:22−cv−00247−RJC−DCK)

───────────────

Argued:  December 11, 2025                          Decided:  January 14, 2026

───────────────

Before WILKINSON, AGEE, and THACKER, Circuit Judges.

───────────────

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Thacker joined.

───────────────

**ARGUED:**  Ralph Thomas Bryant, Jr., RALPH BRYANT LAW FIRM, Greenville, North Carolina, for Appellant. Proloy K. Das, FORDHARRISON LLP, Hartford, Connecticut, for Appellee. **ON BRIEF:**  Frank L. Day, FORDHARRISON LLP, Memphis, Tennessee, for Appellee.

───────────────

WILKINSON, Circuit Judge:

Wilson Air Center, LLC ("Wilson Air"), a private aviation services provider, tried to get DeAnne Haggins, an employee diagnosed with breast cancer during the COVID-19 pandemic, to return to the office on a hybrid schedule. Wilson Air's business had rebounded, and the in-person duties that Haggins previously shifted onto someone else had begun to overwhelm him. Yet while Haggins agreed to the arrangement on paper, she resisted in practice. And after she repeatedly missed work without notice, Wilson Air discharged her. Haggins claims that doing so amounted to discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA").

Given the circumstances, both compassion and real efforts at accommodation were called for. Far from breaking the law, Wilson Air exceeded the call of duty. It allowed Haggins to work full-time from home when business was down, continuing to pay her full salary. The return of business, however, necessitated at least a part-time return to the office. Across nearly three months, Wilson Air reiterated that it wanted Haggins to come into the office, but only as her schedule permitted; took precautions to limit the spread of disease; and excused many of her failures to communicate. But Haggins showed up to work for just two partial days total in the three-month period, often failing to warn any of her coworkers when she would be working from home—or not working altogether. She therefore does not land within the ADA's definition of a "qualified individual." We thus affirm the district court's grant of summary judgment for Wilson Air.

2

I.

Haggins worked at Wilson Air for over sixteen years. In her position as "Accounts Payable (Accounting Assistant)," she was tasked with "[e]nsur[ing] correct payment to vendor[s] and assist[ing] [the] Account Manager," Jon Cox, "on a daily basis." J.A. 249. Many of Wilson Air's payments took the form of paper checks, and vendors often sent their invoices via mail. Wilson Air also retained physical records about every supplier. For a long while, then, Haggins came into the office on a regular basis to perform, among other tasks, the accounts payable and filing portions of her job.

A.

That changed during the COVID-19 pandemic. Its onset understandably caused many Wilson Air employees—including Haggins—to adopt hybrid schedules, where they worked in part remotely and in part in the office. The pandemic also caused "the number of arriving flights, fuel sales, and revenue [to] hit record lows." J.A. 251; *see also* J.A. 179–81. Wilson Air's demand, in other words, crashed.

Meanwhile, Haggins was diagnosed with a "very aggressive form of breast cancer." J.A. 304. Though she kept a hybrid workload for several months, Haggins went fully remote during the summer due to her compromised immune system and constant need for treatment. This required reassigning her in-person responsibilities to Cox.

The arrangement worked well at first. But by March 2021, Wilson Air's business had largely returned to normal. Cox, feeling swamped with long hours, began to express frustration with his workload. So he spoke to the general manager about the possibility of Haggins returning to a hybrid schedule. Cox then messaged Haggins and proposed that she

3

be in the office twice a week for "4–5 hours each day . . . to help out with payables and other admin stuff." J.A. 195. "Okay I think I can handle that," she responded. J.A. 196.

B.

But over the next month, Haggins never came into the office. Eventually, Denise Bond, a supervisor in human resources, messaged Haggins to remind her about working in person. Haggins replied that her oncologist would likely disapprove of her return. Bond told her to get a doctor's note saying as much, and Haggins did so shortly thereafter. Wilson Air, however, did not immediately receive it.

In May 2021, Haggins met with Cox, Bond, and the general manager to again discuss her return to in-person work. The three Wilson Air representatives emphasized that several of Haggins's tasks, particularly accounts payable and filing, required her to be in the office. And when one of them said that these responsibilities needed attention only once per week, Haggins volunteered to "do [them] twice a week" around her ongoing medical treatment. J.A. 211. Haggins also agreed to provide Wilson Air her schedule each week, to the extent she knew it.

But she again did not come into the office. Rather, on May 17, Haggins called the manager of human resources, Emily Cates, to express her dissatisfaction with being required to work partly in person. And on the same day, Wilson Air received the aforementioned doctor's note, dated nearly two weeks earlier.

Haggins thus kept working remotely while Cates learned more about the specifics of her job. To that end, Cates met twice with Cox, Bond, and the general manager. All three explained that many of Haggins's duties needed to be done in person and that other

4

employees could no longer fill in for her. Consequently, on May 25, Cates told Haggins that she needed to report to work in person starting the next day, adding that she could wear a mask and stay in her office with the door closed.

Haggins returned to the office the next morning, working a partial day separated by two medical appointments. The full day afterward, Haggins worked remotely to receive an infusion. And on her next day of work, Haggins again worked partly in the office, leaving early after fluid had continuously and visibly leaked out of the area around her breasts.

C.

That was the last time Haggins worked in person. On June 2, she told Bond that she intended to work the day entirely from home. But Bond refused, responding that Haggins either needed to be physically present or not work at all. Haggins thus took a sick day. Afterward, she saw a doctor regarding the earlier leakage from her chest, scheduling surgery for the next day to fix it. Haggins promptly told both Cox and Bond that she would be unable to work after the procedure. Signing onto her company-issued laptop to do so, she saw a message from Cox telling her to return the computer. According to Haggins, this "meant that [she] could not perform any work[-]related accounting functions from home." J.A. 314.

On June 3, Haggins had the surgery and did not work at all. On June 4, the general manager texted Haggins to ask about the surgery and her status. She responded that she "fe[lt] so much better!!!" but gave no information about when she would next resume work or return to the office. J.A. 187. Over the ensuing weekend, Haggins texted Cox about the surgery and told him that she would be taking sick days until her physician cleared her to

5

return to work. Cox acknowledged receipt on June 7, a Monday, and marked her as sick for the day.

On June 8, Haggins neither reported to work—be it virtually or in person—nor notified anyone that she would be out sick again. Rather than resorting to discipline, Bond emailed Haggins at her personal address to express concern over the unexplained absence and ask her to "[p]lease let [Bond] know what is happening with [Haggins's] situation." J.A. 241. Yet there was no response. Indeed, June 9, and much of June 10, passed without any word from Haggins.

Haggins, for her part, did contact her doctor on June 8 to send a note to Wilson Air. It read "[Haggins] underwent a medically necessary surgery on Thursday 6/3/21 and needs to be out of work for recovery until Thursday 6/17/21." J.A. 243. The letter was dated June 9, and Wilson Air received it on June 10.

Upon receiving the note, Bond convened with Cates. Bond again opted against discipline, believing the better course was to reiterate the importance of communication. To that end, she sent Haggins another email stressing the need to keep her in the loop regarding absences from work. Bond also asked Haggins to "[p]lease contact [Bond] on Wednesday of next week so that [they] can plan for [Haggins's] return the following day." J.A. 245.

Haggins still did not contact Bond, however. Nor did she work at all on June 17 or notify anyone about taking another sick day. Bond and Cates accordingly met once more to discuss the matter, agreeing on the termination of Haggins. Bond then notified Haggins

over email that she had been discharged for "job abandonment"—that is, repeatedly missing work without warning. J.A. 247.

Wilson Air did not hire a full-time replacement. It instead enlisted temporary, in-person work from a third-party agency as needed. Eventually, it moved all accounting functions to its corporate headquarters.

D.

Almost one year later, Haggins sued Wilson Air. In relevant part, she alleged her employer failed to make a reasonable accommodation for her, discriminated against her because of her breast cancer, and retaliated against her for complaining to human resources, all in violation of the ADA. The district court granted summary judgment in favor of Wilson Air, writing that "Haggins fail[ed] to present a *prima facie* case of . . . discrimination, retaliation, or failure to accommodate; and even if she had, Wilson Air brings overwhelming evidence of legitimate business reasons for the decisions it made." J.A. 587–88.

Haggins timely appeals this conclusion. We review it de novo, viewing the evidence and drawing all reasonable inferences in Haggins's favor. *See Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 173 (4th Cir. 2023). If "the record taken as a whole could not lead a rational trier of fact to find for" Haggins, we must affirm. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

II.

Haggins primarily alleges Wilson Air discriminated against her on the basis of her breast cancer, which the parties agree is an ADA-recognized "disability." Underlying this

7

claim are two theories: First, in Haggins's view, Wilson Air failed to make a reasonable accommodation when it told her that she could no longer work remotely and needed to turn in her company-issued laptop. Second, Haggins alleges Wilson Air discharged her "because of her disability," a claim sounding in disparate treatment but framed generically in the briefing as simple discrimination. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003). Whatever the theory, Haggins does not meet a predicate condition for discrimination under the ADA: she is not a "qualified individual."

A.

That an employee has a disability does not automatically mean she is entitled to the ADA's protections. "No matter the type of discrimination alleged," the employee must show first that she is a "qualified individual." *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997). Thus, whether characterized as a failure to accommodate or general disability discrimination, an ADA claimant like Haggins must be someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see, e.g.*, *Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 165, 172 (4th Cir. 2024). Three parts of this prerequisite bear emphasis.

First, even when an employee cannot perform a job on its face, she may still be a qualified individual if a "reasonable accommodation" enables her to so perform. In this sense, the determination of a qualified individual is intertwined with the availability of a reasonable accommodation.

8

Second, regardless of any accommodation suggested by the employee or offered by the employer, the claimant must be able to do the job's "essential functions." "[T]he decision about a position's essential functions belongs, in the first instance, to the employer; it accordingly merits 'considerable deference' from the courts." *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998)). Indeed, we do not second guess an employer's assessment of a position's essential functions so long as they "bear more than a marginal relationship to the job at issue." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir.1993)); *see* 29 C.F.R. § 1630.2(n)(1). In applying this deferential framework, we "consult the full range of evidence bearing on the employer's judgment," such as a position's written job description and testimony from senior employees. *Elledge*, 979 F.3d at 1009.

Third, implied in the definition of a "qualified individual" is a reciprocal obligation between the employee and employer to engage in a good faith, collaborative search for a reasonable accommodation. *See Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 181 (4th Cir. 2024). "To determine the appropriate reasonable accommodation," in other words, "it may be necessary for the" employer "to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). And if the individual declines to engage in this cooperative bargaining, she cannot then cry foul at the employer. *Elledge*, 979 F.3d at 1013.

9

B.

With these guideposts in mind, there is agreement that certain essential functions of Haggins's job could be performed only on work premises. Listed in the written description for her accounting assistant role are "day to day activities" like "[p]ost[ing] and enter[ing] all incoming invoices for payments," "[m]aintain[ing] payables files," and "[p]repar[ing] checks for distribution." J.A. 249. All of these tasks are premised on being in the office; according to Wilson Air's controller, the company receives vendor invoices—many via mail—just about daily, and Haggins must enter these invoices, print checks, prepare paper packets for the general manager's signature, assemble envelopes for mailing, and file physical copies of each document. Small wonder that her job description goes on to explain how the "[w]ork [e]nvironment" is that of an "airport . . . with duties both indoor and outdoor," saying nothing about the possibility for remote work. J.A. 249.

Haggins's need to return to the office should come as no surprise. "[A] regular and reliable level of attendance is a necessary element of most jobs." *Tyndall*, 31 F.3d at 213. Indeed, Haggins herself attested several times that her payables and filing duties demanded in-person attendance, going so far as to volunteer to work in the office twice per week.

True, during the lull in demand for private aviation, Cox took on Haggins's in-office duties so that she could work remotely full-time. But when business bounced back, Cox began to "repeatedly complain[] about his workload," J.A. 175, 188, signaling the need for Haggins to reassume the responsibilities. This is common: agency guidance to the ADA explains how a cyclical industry can "make the performance of each function during the peak periods more critical and might limit the employer's flexibility in reorganizing

10

operating procedures." 29 C.F.R. pt. 1630 app. § 1630.2(n) (2025). And as our court has held, "employers do not need to change a job's essential functions or split them across multiple employees." *Elledge*, 979 F.3d at 1013.

C.

Wisely, then, Haggins does not claim on appeal that she can fulfill the duties of an accounting assistant while *fully* working from home. She instead chooses a more modest theory: if Wilson Air gave her the reasonable accommodation of a *hybrid* schedule that it had promised, her argument goes, she would have been able to perform her job's essential functions—making her a qualified individual under the ADA. But Wilson Air did not renege on the parties' compromise for a hybrid schedule. Haggins did.

Over and over, Wilson Air expressed openness to Haggins working in the office part-time and teleworking for the rest of her hours; each time, Haggins purported to accept yet failed to follow through. In March 2021, Cox asked Haggins if she could show up to work in person for "4–5 hours" twice each week. J.A. 195. Haggins agreed, but then she never once came to the office. In May 2021, various Wilson Air employees reiterated the need for Haggins to return to work in the office on at least a part-time basis, giving her the flexibility to "come in around her schedule" of medical appointments. J.A. 211. Again, Haggins agreed but then never once came to the office. Only after a nearly two-month-long absence from in-person work—despite Haggins's multiple promises to show up—did Wilson Air begin to demand fully in-person attendance. And even then, Haggins worked just two partial days in person before disclosing her intention to resume remote work full-time.

11

Doing the math, in the eighty-day period between Cox's initial request for Haggins to work a hybrid schedule and Haggins's termination, she came to work in person for just two days in part. That comes nowhere near the routine, in-office attendance necessary for Haggins to perform her accounts payable and filing functions—let alone the two-day-per-week schedule she had promised. Thus, while she laments her alleged inability to work a hybrid schedule, "this path to fulfilling [some] of the job's essential functions was foreclosed by" Haggins "h[er]self." *Elledge*, 979 F.3d at 1013.

Compounding the problem was Haggins's continued failure to communicate her absences. At numerous junctures, Wilson Air expressed receptiveness to arranging a hybrid schedule tailored to Haggins's medical needs, so long as she simply conveyed those needs. During the May meeting with Haggins, for instance, Bond and the general manager emphasized the value of Haggins sharing her schedule with Wilson Air weekly. Likewise, after Haggins did not show up to work on June 8, Bond emailed her asking that she keep Wilson Air updated about her status. When Wilson Air later received a doctor's note explaining why Haggins had been, and would continue to be, out of the office, Bond wrote that the company needed to know about such absences in advance. Bond also asked Haggins to contact her at the end of the timeframe covered in the doctor's note, which was then six days out, to coordinate her return.

But Haggins did not contact anyone on this proposed day. She instead opted to miss two full weeks of work with only a doctor's note, sent partway through the period of absence, specifying when she would return. Worse still, whereas the note stated she "need[ed] to be out of work for recovery until Thursday 6/17/21," J.A. 243, Haggins neither

12

returned to work on June 17 nor communicated this absence to Wilson Air. To the extent one can reasonably read "until" in this note to mean Haggins could return only *after* June 17, she failed to clarify the misunderstanding with Bond, whose email clearly described "Wednesday"—that is, June 16—as the final day of absence. J.A. 245. And even assuming Haggins did not check her personal email (the destination of Bond's correspondence) at all in the two weeks after her surgery, as Haggins claims, this does nothing to dispel the reasonable inference drawn from Wilson Air's perspective: Haggins had received Bond's communications but never answered them. *See Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) ("It is the perception of the decision maker which is relevant.").

Haggins also emphasizes on appeal how Cox once asked her to turn in her laptop, which effectively barred her from remote work. Yet Cox did so only after Haggins went back on her word and spent the last two months working almost entirely from home. Such recourse was not just lawful, but also entirely reasonable: Haggins made clear that she did not intend to work in person despite her prior assurances, at which point her employer tried to more strongly incentivize her to show up. Wilson Air, "possessing 'ultimate discretion' over the choice among reasonable accommodations, was not—in the face of" Haggins's "rejections of such an obvious and helpful offer—required to extend another." *Elledge*, 979 F.3d at 1013.

## D.

It need not be said that we take seriously Haggins's battle with breast cancer; cancer can be a formidable foe. We recognize that many of Haggins's absences can be attributed to her regrettably long suffering from this disease. But therein lies the problem. Even with

13

the reasonable accommodation of a hybrid schedule, Haggins could not show up to work to perform her position's essential functions, or at least timely notify Wilson Air whenever she would be out of the office. That means she is not a qualified individual, rendering the ADA's protections inapplicable.

The undisputed facts reveal that Wilson Air frequently went beyond the ADA's baseline in trying to accommodate Haggins. To wit: it reassigned several of her essential functions to Cox, reverting only when its business needs changed. It permitted Haggins to work a hybrid schedule, even giving her the freedom to choose the days and times in which she would come into the office. It took precautions to minimize Haggins's exposure to illness while on the business's premises. It continued trying to cooperate with Haggins after she went back on her word about hybrid work. And it refrained from discharging her after she missed a day of work—that is, did not so much as sign in remotely—and left the company with only a doctor's note sent *after* the absence for an explanation.

To hold the employer liable for disability discrimination, after all these commendable efforts at bilateral cooperation, would do a disservice to Wilson Air and the ADA alike. "Courts should not discourage employers from going beyond the [ADA's] requirements . . . ." *Reyazuddin v. Montgomery County*, 754 F. App'x 186, 190 (4th Cir. 2018). Yet that is effectively what Haggins asks us to do here.

III.

Haggins's retaliation claim likewise misses the mark. The ADA, of course, forbids retaliation against employees who have engaged in protected activity. 42 U.S.C. § 12203. And notably, this antiretaliation provision covers everyone—not just qualified individuals.

14

*See Morgan v. Joint Admin. Bd., Ret. Plan of Pillsbury Co. & Am. Fed'n of Grain Millers*, 268 F.3d 456, 458 (7th Cir. 2001). Haggins accordingly alleges Wilson Air committed unlawful retaliation by discharging her one month after she engaged in protected activity— that is, after she lodged a complaint to human resources about the employer's hybrid-work mandate.

We disagree. Required in a prima facie case for retaliation is some showing that "a causal connection existed between the protected activity and the adverse action." *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). Haggins falls short of this burden; in fact, Wilson Air went out of its way to support and accommodate her struggle with breast cancer, resorting to termination only after excusing nearly a calendar quarter of Haggins's broken promises about returning to the office and failures to communicate her schedule. The email formally discharging Haggins confirms as much. In it, Bond explained that Haggins had missed over two weeks of work and repeatedly failed to notify Wilson Air when she would return, even after being expressly asked to do so.

Contesting this ready conclusion, Haggins claims first that the stated reasons for termination in Bond's email were false. But as already explained at length, the uncontested facts reveal numerous points at which Haggins missed in-person work, or work altogether, without timely notifying Wilson Air. Indeed, whereas Haggins alleges that testimony from Cates (recall, the human resources manager) contradicts the contents of Bond's email, the record indicates otherwise: Cates explained how Wilson Air fired Haggins because "[t]here was no communication" and "[s]he was not coming in the office to do her job," J.A. 499— the very complaints aired in Bond's email.

15

That leaves just the proclaimed temporal proximity between the protected activity and discharge. As Haggins reminds us, a particularly close proximity can suffice for a prima facie case of retaliation in some cases. *See, e.g.*, *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001); *cf. Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (stating in Title VII setting "that the temporal proximity must be 'very close'" (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001))).

But not here. For starters, the relevant timeframe for our temporal-proximity analysis is one month. This is because the clock for Wilson Air's alleged retaliation started ticking when Haggins complained to human resources on May 17, not when Wilson Air denied her request to work from home full-time, as Haggins at points implies. After all, the ADA's antiretaliation provision covers retaliation against actions taken *by the individual*. *See* 42 U.S.C. § 12203.

Moreover, the one-month interim between Haggins's protected activity and discharge, standing alone, does not suffice to show the causal link needed for her prima facie case of retaliation. Again, Wilson Air went well beyond the ADA's obligations in trying to work things out for Haggins, continuously attempting to reach a compromise in which she could fulfill her job's essential, in-person functions without threatening her health or obstructing her medical treatment. That is accommodation, not retaliation. And these efforts at accommodation continued *after* Haggins lodged her complaint with human resources.

16

IV.

Wilson Air is not the type of intransigent employer that the ADA was designed to set straight. Again and again, it tried to strike a mutually beneficial deal with Haggins that allowed her to work a hybrid schedule and that was mindful both of her compromised immune system and her need to regularly seek treatment. But Haggins declined to cooperate, opting instead to make and break promises about returning to the office—often without notice to boot. Had there been effort at both ends, this dispute might have reached a more fortunate end. As it is, the district court's judgment must be affirmed.

*AFFIRMED*