**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 22-1825**

―――――――――

LAURA E. TARTARO-MCGOWAN,

        Plaintiff – Appellant,

    v.

INOVA HOME HEALTH, LLC; ALTERNATE SOLUTIONS HEALTH
NETWORK, LLC,

        Defendants – Appellees.

―――――――――

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  Rossie David Alston, Jr., District Judge.  (1:21-cv-00298-RDA-TCB)

―――――――――

Argued:  October 27, 2023                    Decided:  January 17, 2024

―――――――――

Before AGEE, HARRIS, and HEYTENS, Circuit Judges.

―――――――――

Affirmed by published opinion.  Judge Agee wrote the opinion in which Judge Harris and
Judge Heytens joined.

―――――――――

**ARGUED:**  Tamara Leora Slater, ALAN LESCHT & ASSOCIATES, PC, Washington,
D.C., for Appellant.  Andrew J. Wolf, HAHN LOESER & PARKS LLP, Cleveland, Ohio,
for Appellees. **ON BRIEF:**  Timothy M. Belknap, ALAN LESCHT & ASSOCIATES, PC,
Washington, D.C., for Appellant.  Steven E. Seasly, HAHN LOESER & PARKS LLP,
Cleveland, Ohio, for Appellees.

―――――――――

AGEE, Circuit Judge:

Laura Tartaro-McGowan was terminated from her position as a clinical manager with Inova Home Health, LLC—a home health agency that provides healthcare services to patients in their home—after failing to perform direct patient care field visits by a specified date. She then sued Inova Home Health and related company Alternate Solutions Health Network, LLC (collectively, "Defendants"), bringing claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, for failure to accommodate, discrimination, and retaliation. The district court awarded summary judgment to Defendants on all claims. For the reasons explained below, we affirm.

I.

A.

During her nearly four-decade career as a registered nurse, Tartaro-McGowan spent seventeen years as a field nurse with a separate home health agency of Inova Health System. In this role, Tartaro-McGowan regularly provided direct care to patients in their homes. Following bilateral knee replacement surgeries in 2016 and 2017, however, Tartaro-McGowan developed chronic arthritis in her knees. This condition limited her ability to perform certain tasks requiring her to squat, kneel, bend, or otherwise put stress on her knees. Feeling no longer able to safely perform direct patient care field visits given her condition, Tartaro-McGowan transitioned into a supervisory position as a clinical manager in July 2017.

2

In September 2018, Inova Health System and Alternate Solutions Health Network, LLC, entered into a joint venture, creating Inova Home Health, LLC. This newly created entity, based in Northern Virginia, took over many of the home health services that Inova Health System previously provided. Alternate Solutions Health Network, which exercised management responsibilities over Inova Home Health, interviewed Tartaro-McGowan for various positions with the new company, and she was again offered a clinical manager position.

Tartaro-McGowan's offer letter included a job description outlining her duties and responsibilities as a clinical manager. That description contained three sections relevant to this appeal. The first section was titled "Major Areas of Responsibility" and included the following bullet-point statement: "Completes field visits as needed providing direct patient care upon Administrator discretion." J.A. 315–16. The second section was titled "Essential Functions" and included the following bullet-point statement: "Arrives at assigned location on scheduled work day. Works according to designated hours and on-call as needed in office and field nursing responsibilities." J.A. 316. The final relevant section was titled "Health Qualifications" and outlined several physical requirements of the position. J.A. 316–17. These included bending occasionally, lifting up to 50 pounds with or without assistance occasionally, and stooping (bending at the waist) occasionally.

The job description concerned Tartaro-McGowan insofar as it required her to sometimes provide direct patient care given her knee arthritis. She testified that she raised her concerns with Inova Home Health's hiring representatives and received assurances that she would not be required to provide *direct* patient care in her role as a clinical manager

3

and that any field visits would be "very infrequent" and "supervisory in nature." J.A. 162–63. In other words, although Tartaro-McGowan would still be expected to go into the field, she understood that her primary duty would be to observe and monitor *another clinician* administrating direct care to the patient, assisting hands-on only when needed. Based on these alleged assurances,[1] Tartaro-McGowan accepted the clinical manager position.

From September 2018 to May 2020, Tartaro-McGowan performed only supervisory field visits—between ten and fifteen total—during which she primarily observed another clinician providing direct patient care. On at least one of these occasions, Tartaro-McGowan provided direct care by drawing a patient's blood when the field nurse she was supervising was unable to do so. Tartaro-McGowan did not otherwise perform any direct patient care field visits during that time period.

With the onset of the COVID-19 pandemic in the spring of 2020, Inova Home Health, like other healthcare providers, experienced a severe shortage of field clinicians. To cope with this staffing shortage and meet its ongoing patient care obligations, Inova Home Health in May 2020 informed its internal staff, including clinical managers, that they would be required to perform direct patient care field visits going forward until the company could hire additional field nurses. Inova Home Health also announced that staff

---

[1] The record contains directly conflicting testimony on this point. Inova Home Health representatives testified that they told Tartaro-McGowan from the beginning that the clinical manager position would entail supervisory field visits *and* direct patient care field visits. They also testified that Tartaro-McGowan never alerted them to any physical limitations. These factual disputes, however, are not material to our decision.

4

from Alternate Solutions Health Network's headquarters in Dayton, Ohio, would assist with some field visits and office administrative functions.

Given her chronic knee arthritis, Tartaro-McGowan requested via email an accommodation excusing her from performing any direct patient care field visits. In support of her request, she submitted a letter from her primary doctor explaining that her "chronic arthritic issues . . . do not allow her to squat or get very low" and requesting that "she be employed in a different capacity which will not require her to bend her knees or otherwise put stress on her lower extremities." J.A. 717. Joan VanZant, Alternate Solutions Health Network's Director of Human Resources, responded to Tartaro-McGowan's request:

> We are in receipt of your note requesting a reasonable accommodation for your disability of chronic arthritis by avoiding stress to your knees or lower extremities. We are not able to accommodate your request to eliminate field visits altogether, but will support you screening patients/visits so you can participate in selecting field visits, helping to avoid the need to squat and bend your knees. We can also accommodate a schedule during the week so that visits are not being completed back-to-back; rather, they could be spread out during the week as much as possible.

J.A. 337–38. Tartaro-McGowan responded by asking what her "options" would be if she chose "not to go in the field." J.A. 337. VanZant answered that such refusal could subject her to "disciplinary action." J.A. 337.

Approximately two weeks later, Tartaro-McGowan submitted a second note from her primary doctor addressing Inova Home Health's proposed accommodation of allowing Tartaro-McGowan to "screen patients before seeing them." J.A. 342. The note stated:

> I do not think this is a reasonable solution. Even if her initial screening would suggest that a patient could be cared for without these requirements, that can

5

never be truly determined until she is at the home doing a proper nursing assessment. Once in the home, she would have a professional obligation to address the patient's needs and she may not be able to do that adequately because of her arthritic issues.

J.A. 342.

A few days later, Kathleen Nesterick, Inova Home Health Field Administrator, confirmed receipt of the second doctor's note and responded:

I appreciate your concern related to your ability to make field visits. We have offered to allow you to screen and select appropriate visits that would greatly reduce the possibility of injury. Your 17+ years of field experience gives you an additional advantage of knowing how to properly screen patients. Selecting the 48 hr. lab/transplant patients would be an example of the type of visit that you could make. These patients are not homebound and are able to move about. We want to work with you, and are therefore asking what form of additional accommodation, other than not going into the field (which is an essential function of your position), are you requesting?

J.A. 347.

In reply, Tartaro-McGowan reiterated her concerns with her physical restrictions, this time noting that "it's really not the patient type[;] [it's] all about the layout of the [patient's] home, where their care is provided, and if the patient has any untoward reaction to their care/treatment." J.A. 346. Proposing no alternative, she again requested to be totally exempt from "caring for patients in the field." J.A. 346.

Nesterick wrote to Tartaro-McGowan a second time, again offering her the option to "choose which patients to visit so as to avoid physical type challenges you may foresee"; emphasizing the need for internal staff to perform direct patient care field visits due to the "staffing challenges" brought about by the pandemic; and requesting confirmation as to whether she would be "assisting with field visits of your choosing." J.A. 349.

6

But Tartaro-McGowan again refused, maintaining that the proposal was not "responsive to [her] medical needs." J.A. 349. She also expressed her belief that "it would [not] be unduly burdensome for Inova Home Health" to excuse her from direct patient care field visits as the number of patients needing care had, at least in her view, "decreased by a substantial amount" and Inova Home Health had hired additional field nurses. J.A. 348–49. Finally, Tartaro-McGowan indicated that she would file a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") if they could not "come to an agreeable accommodation." J.A. 349. As with her previous correspondence, however, Tartaro-McGowan proffered no alternative to her preferred accommodation of complete exemption.

On June 22, 2020, Nesterick issued Tartaro-McGowan a final warning:

> I am in receipt of your response. As you know from my prior emails, field visits are an essential job function. It is especially important at this time, to provide needed care to our patients as well as offer support to your fellow clinicians. While the volume of patients requiring visits may fluctuate, the function of providing field visits is part of a clinical manager's job description. The newly hired staff are at various stages of onboarding and training. They are not yet able to offer the full productivity assistance needed at this time, which is why our internal team is assisting with patient care. As you know from prior communications, you were offered the accommodation of choosing which patients to visit so as to avoid physical type challenges you may foresee.
>
> I do need to inform you that this is your final warning. I expect that you will be available to see patients in the field beginning Wednesday June 24th. If you decide not [to] go into the field, then this will be considered job abandonment, and you will no longer be employed by Inova Home Health effective June 24th.

J.A. 352.

7

Tartaro-McGowan says that she was scheduled to perform a direct patient care field visit on June 24, but that morning the patient's spouse asked to reschedule the appointment for another day. Tartaro-McGowan therefore did not conduct that field visit, or any other, that day. Notably, when asked during her deposition whether she "tr[ied] to pick up another patient on the 24th to go out into the field," Tartaro-McGowan responded, "No, I did not." J.A. 279.

Having failed to conduct any direct patient care field visits by June 24, Tartaro-McGowan emailed Nesterick on the morning of June 25, seeking clarification as to whether she still had a job. Nesterick responded: "This communication confirms that you did not make any field visits on Wednesday June 24th as requested, and also had cleared out your office as of Tuesday, June 23. You have effectively abandoned your job and your last day of employment, as per my prior email, was Wednesday June 24th." J.A. 355.

Only one other internal staff member—a clinical staff liaison—refused to perform any direct patient care field visits. She too was terminated.

By the fall of 2020, Inova Home Health's staffing levels stabilized and internal staff were no longer required to perform direct patient care field visits.

8

B.

Following an unsuccessful EEOC charge of discrimination, Tartaro-McGowan sued Defendants in federal district court. Relevant here, her complaint alleged three claims under the ADA for failure to accommodate, discrimination, and retaliation.[2]

The district court granted summary judgment to Defendants on all claims. *Tartaro-McGowan v. Inova Home Health, LLC*, No. 1:21-cv-298 (RDA/TCB), 2022 WL 2232190, (E.D. Va. June 21, 2022).

Beginning with the failure-to-accommodate claim, the district court found that Tartaro-McGowan failed to satisfy two of the four elements required to establish a prima facie case: (i) that she could perform the essential functions of the job with reasonable accommodation, and (ii) that Defendants refused to make such an accommodation. Concerning the first of these elements, the court determined that performing direct patient care field visits was an "essential function" of the clinical manager position, as that term is defined by the ADA's implementing regulations. *See* 29 C.F.R. § 1630.2(n). And reasoning that Tartaro-McGowan logically could not perform that essential function if Defendants granted her request not to perform it at all, the court concluded that she was not a "qualified individual" entitled to the ADA's protections. 42 U.S.C. § 12111(8). Regarding the second element, which requires a showing that the employer refused the plaintiff a reasonable accommodation, the court found that Defendants *did* offer Tartaro-McGowan a reasonable

---

[2] Tartaro-McGowan brought a fourth claim for age discrimination, but that claim is not raised on appeal, so we do not address it.

accommodation, namely, "the option to screen patient field visits and to accept only those visits [she] believed she could complete with her physical limitations." *Tartaro-McGowan*, 2022 WL 2232190, at *6. But Tartaro-McGowan rejected that reasonable accommodation, independently precluding her classification as a "qualified individual" under the ADA. *Id.* at *7 (citation omitted).

As to the discrimination claim, the district court found that Tartaro-McGowan failed to prove three of the four elements required to make out a prima facie case. In particular, the court held that while she had put forth sufficient evidence to prove that she suffered an adverse employment action, she had not shown that she was qualified for her position, that she was meeting her employer's legitimate expectations at the time she was fired, or that she was fired under circumstances giving rise to a reasonable inference of discrimination. The court went on to explain that even if she could establish a prima facie case of discrimination, Defendants had provided a legitimate, non-discriminatory reason for ending her employment and Tartaro-McGowan had failed to show that Defendants' proffered justification was pretext for unlawful discrimination.

Finally, turning to the retaliation claim, the district court found that Tartaro-McGowan had established a prima facie case of retaliation, observing the close temporal proximity between her request for an accommodation and her termination. Nonetheless, the court reiterated that Defendants had provided a legitimate, non-retaliatory reason for firing Tartaro-McGowan and that she again failed to show that Defendants' stated reason was pretextual.

10

Tartaro-McGowan now appeals these adverse findings. We have jurisdiction under 28 U.S.C. § 1291.

II.

We review the district court's summary judgment award de novo, applying the same legal standards as the district court and viewing all facts in the light most favorable to the nonmoving party. *Bowen v. Adidas Am. Inc.*, 84 F.4th 166, 172 (4th Cir. 2023). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

III.

The ADA bars covered employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a). Discrimination can include failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Id.* § 12112(b)(5)(A). The ADA also prohibits covered employers from retaliating against "any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." *Id.* § 12203(a).

Here, Tartaro-McGowan avers that the district court committed several errors in granting summary judgment to Defendants on her ADA claims. She contends that the

11

district court improperly weighed the evidence in finding that performing direct patient care field visits was an essential function of the clinical manager position and that, in any event, Defendants' proposed accommodation was not reasonable. She further argues that, contrary to the district court's findings, she provided sufficient evidence from which a reasonable jury could infer that Defendants' decision to terminate her stemmed from unlawful discriminatory and retaliatory intent.

A.

We begin with Tartaro-McGowan's failure-to-accommodate claim.

"To survive summary judgment on such a claim under the ADA, a plaintiff must show (i) she was disabled, (ii) the employer had notice of her disability, (iii) she could perform the essential functions of her position with a reasonable accommodation, and (iv) the employer refused to make such accommodation." *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022) (citation omitted).

As below, Defendants do not contest that Tartaro-McGowan has satisfied the first two elements. So we proceed to the third and fourth elements.

The third element requires a showing that the plaintiff can perform the essential functions of the position with a reasonable accommodation. If the plaintiff cannot perform the essential functions of the job, with or without a reasonable accommodation, then she is not a "qualified individual" under the ADA and therefore has no legal entitlement to an accommodation. 42 U.S.C. §§ 12111(8), 12112(b)(5)(A); *see also Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020); 29 C.F.R. Pt. 1630, App. ("An employer or other covered entity is not required to reallocate essential functions."). A plaintiff's

12

success or failure on this element, then, turns on "just what the essential functions of [the plaintiff's] position [are]." *Elledge*, 979 F.3d at 1009.

The ADA's implementing regulations outline seven non-exhaustive categories of evidence that inform that inquiry:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

In its analysis, the district court found that evidence in the record corresponding to categories (i), (ii), (iv), and (vii) favored a finding that performing direct patient care field visits was an essential function; that evidence corresponding to category (iii) cut against such a finding; and that evidence corresponding to category (vi) was neutral.[3] "Weighing all of the[se] factors," the district court concluded that performing direct patient care field visits was an essential function of the job and that Defendants therefore were not obligated

---

[3] Because there is no collective bargaining agreement at issue in this case, the district court correctly found that category (v) is inapplicable.

13

to grant Tartaro-McGowan's requested accommodation of being totally exempt from performing such visits. *Tartaro-McGowan*, 2022 WL 2232190, at *5.

On appeal, Tartaro-McGowan argues that the district court improperly usurped the role of the jury by weighing the record evidence and drawing negative inferences against her. Defendants disagree, asserting that the district court did not resolve any disputed questions of fact but instead relied on the undisputed evidence to appropriately conclude that performing direct patient care field visits was an essential function of the job. And because Tartaro-McGowan sought total exemption from that essential function, Defendants say that she cannot show that she was a "qualified individual" who could have performed the essential functions of the position with or without a reasonable accommodation. Alternatively, Defendants argue that even if performing direct patient care field visits wasn't an essential function of the job such that Tartaro-McGowan could satisfy the third element of her prima facie case, her claim still fails on the fourth element because Defendants offered her a reasonable accommodation, which she refused.

We need not address whether the district court improperly weighed the evidence in resolving the essential-function question at the summary judgment stage. Instead, we affirm on the alternative basis Defendants identify: that no reasonable jury could conclude that Defendants denied Tartaro-McGowan a reasonable accommodation.

The ADA does not provide an all-inclusive definition of the term "reasonable accommodation." Instead, it provides examples of what a "'reasonable accommodation' *may* include," like "job restructuring, part-time or modified work schedules, reassignment

14

to a vacant position . . . and other similar accommodations." 42 U.S.C. § 12111(9)(B) (emphasis added).

From this language, we have distilled a few key principles that help define the scope of the term "reasonable accommodation." To begin, we have observed that "the range of reasonable accommodations is broad," a truth reflected by the ADA's text, which is "illustrative rather than exhaustive." *Elledge*, 979 F.3d at 1011.[4] We have further explained that "what counts as a reasonable accommodation is not an *a priori* matter but one that is sensitive to the particular circumstances of the case." *Id.* Finally, we have noted that "what will serve as a reasonable accommodation in a particular situation may not have a single solution, but rather, many possible solutions." *Id*. For that reason, an employer is not necessarily required to "provid[e] the exact accommodation that the employee requested." *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 415 (4th Cir. 2015). To the contrary, where "an employee may be accommodated through a variety of measures, the employer, exercising sound judgment, possesses the ultimate discretion over these alternatives." *Elledge*, 979 F.3d at 1011 (cleaned up). And as long as the employer's chosen accommodation is reasonable, even if not perfect, our inquiry is at an end—"not even a well-intentioned court may substitute its own judgment for the employer's choice." *Id.* at

---

[4] This view of "reasonable accommodation" is consistent with the ADA's implementing regulations, which similarly define that term broadly: "Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

15

1012; *see also Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 433 (4th Cir. 2015) (stating that the ADA "requires a 'reasonable' accommodation, not a perfect one").

With these principles firmly in mind, we consider Tartaro-McGowan's claim that Defendants' proposed accommodation was not reasonable. And we begin with a point of clarification. According to Tartaro-McGowan, if the performance of direct patient care field visits was not an essential function of her position—which we assume, without deciding, to be true for purposes of this appeal—"then her request to forego such visits [was] no longer unreasonable." Opening Br. 33. That is to say, Tartaro-McGowan suggests that whenever the job function at issue is not an essential function, then a reasonable accommodation *necessarily* entails the outright elimination of that function from the employee's duties. Put simply, that is not the law.

To be sure, a reasonable accommodation "*may*" entail a job restructuring that "reallocat[es] or redistribut[es] nonessential, marginal job functions." 29 C.F.R. Pt. 1630, App. (emphasis added). But we have never held—and Tartaro-McGowan cites no case that says—that an employer must *always* reallocate nonessential job functions in order for a given accommodation to be reasonable.[5] And we will not do so now. Indeed, as just

---

[5] The cases Tartaro-McGowan cites confirm what we have just said: a reasonable accommodation *may*—not must—include the reallocation of nonessential functions. *See E.E.O.C. v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 593 (4th Cir. 2015) (per curiam) (stating that "reallocating or redistributing nonessential, marginal job functions is a *potential* reasonable accommodation" (emphasis added) (cleaned up)); *Brown v. Martin Marietta Materials, Inc.*, 440 F. Supp. 3d 503, 512 (M.D.N.C. 2020) ("Reasonable accommodations that allow an employee to perform the essential functions of his position *may* include job restructuring by reallocating or redistributing nonessential, marginal job functions[.]" (emphasis added) (cleaned up)).

discussed, "what counts as a reasonable accommodation . . . is sensitive to *the particular circumstances of the case*." *Elledge*, 979 F.3d at 1011 (emphasis added). To accept the categorical rule Tartaro-McGowan advances would be to jettison that well-settled principle and break with our precedents. This we cannot do.

Accordingly, our inquiry is whether a jury could fairly conclude that Defendants' proposed accommodation, which did not totally eliminate direct patient care field visits from Tartaro-McGowan's position, was unreasonable in light of "the particular circumstances of the case." *Id.* We answer that question in the negative. Therefore, judgment was appropriately entered on behalf of Defendants.

At the outset, we bear in mind the context in which Tartaro-McGowan's request for an accommodation was made as it sets the backdrop against which we evaluate the reasonableness of Defendants' proposed accommodation.

In the spring of 2020, the COVID-19 pandemic devastated the United States, its people, and its businesses. Inova Home Health was no exception. Like countless other healthcare providers, Inova Home Health sustained a severe shortage of nursing staff and a corresponding increase in challenges involving patient care. *See* J.A. 442, 445 (Nesterick testifying that Inova Home Health lost several clinicians during the pandemic and that there were "patients that needed visits"); J.A. 568, 584, 586–87 (testimony concerning Inova Home Health nursing shortages created by COVID-19); J.A. 647 ("Throughout the pandemic, we saw increased turnover related to our clinicians in the field. It created challenges for patient care."). Tartaro-McGowan herself acknowledged this reality during her deposition. *See* J.A. 217–19.

17

Faced with these pressing circumstances, Inova Home Health made a business judgment call: all internal staff would be required to assist with direct patient care field visits until Inova Home Health secured adequate staffing to fully meet its patients' needs. And that judgment call was not arbitrary. Inova Home Health representatives testified without contradiction that the company deemed it to be the best solution to its immediate dilemma, which was a severe lack of field nurses adversely affecting patient care. Nesterick testified, for example, that it was critical for internal staff, including clinical managers, to assist with field visits given the shortage of field nurses—that "*everyone* had to help" to "mak[e] sure patients [were] seen and taken care of" because it "was definitely a needed time." J.A. 442–43 (emphasis added); *see also* J.A. 445 (Q: "[H]ow important was it to get internal staff out into the field?" A: "It was important. We had patients that needed visits."). VanZant similarly testified that the decision to require internal staff to perform direct patient care field visits "was a solution that was developed" to deal with the "substantial need for assistance" during "an unprecedented time." J.A. 504–05. Such testimony is consistent with what Tartaro-McGowan was told at the time she requested to be excused from this requirement. *See* J.A. 349 ("[I]n light of the pandemic and staffing challenges our agency has faced as a result, all internal office staff have been asked to assist with field visits in order to support our patients and fellow clinicians."). Tartaro-McGowan offers no evidence calling any of this into question.

Given these exceptional circumstances, coupled with the "ultimate discretion" that employers enjoy in selecting between potential accommodation alternatives, *Elledge*, 979 F.3d at 1011 (citation omitted), a rational jury could not conclude that Defendants acted

18

unreasonably in denying Tartaro-McGowan's request to be totally exempt from performing direct patient care field visits. Indeed, the undisputed evidence shows that the *very reason* for the internal-staff requirement was a severe lack of hands on deck to fulfill Inova Home Health's central mission—patient care. It is no surprise, then, that Defendants were unwilling to exacerbate its burden by wholly excusing Tartaro-McGowan, a registered nurse with over seventeen years of valuable field experience, from the internal-staff requirement and further reducing its pool of available field nurses to carry out that mission.

At bottom, the reallocation of nonessential duties *may* be necessary to effect a reasonable accommodation in certain cases, but this is not one of them.

So we turn to the accommodation that Defendants actually offered. No less than four times, Defendants offered Tartaro-McGowan the option to screen field visits and self-select those assignments she felt comfortable performing in light of her physical restrictions. Such screening, Defendants have shown, would have allowed Tartaro-McGowan to review a particular patient's medical file to assess his or her condition, mobility status, and treatment needs, including whether the use of any special equipment was required. It would have also provided Tartaro-McGowan with information about the layout of the patient's home, including the presence of any "steps required to enter into the home, as well as steps required to gain access to bedrooms and bathrooms," J.A. 572—information that specifically addressed a key concern of Tartaro-McGowan's, *see* J.A. 346 ("[I]t's really not the patient type[;] [it's] all about the layout of the [patient's] home, where their care is provided."). And for any information not found in the patient's file, Tartaro-McGowan would have been able to reach out to another clinician who had previously

19

treated the patient for additional insight. With this collective information, Tartaro-McGowan could have avoided any field assignment that her physical restrictions would not have allowed her to complete.

In addition to allowing Tartaro-McGowan to self-select field assignments, Defendants said that they would allow her to "spread out" her field visits "during the week as much as possible." J.A. 338. This would avoid the need for Tartaro-McGowan to make "back-to-back" visits, further minimizing any potential stress to her knees. J.A. 338.

Critically, Tartaro-McGowan doesn't dispute any of these facts on appeal. Nor does she dispute that she flatly and repeatedly rejected Defendants' proposed accommodation and refused to propose any alternative when asked to do so. Instead, the undisputed evidence shows, she insisted that she not be required to perform any direct patient care field visits whatsoever, no matter the accommodation.

Despite all that, she maintains that her refusal to accept anything less than total exemption from the internal-staff requirement was justified. According to her brief, this is so for two reasons.

The first is that Inova Home Health offered *all* internal staff the option to screen and self-select field assignments, not just Tartaro-McGowan. And because that option was not made available only to her, it was not an accommodation at all. At oral argument, however, counsel abandoned this argument and conceded that an accommodation is not ineffective simply because it is available to other employees regardless of disability status. Oral Argument at 12:30–13:27, https://www.ca4.uscourts.gov/OAarchive/mp3/22-1825-

20

20231027.mp3; *see also Yochim v. Carson*, 935 F.3d 586, 592 (7th Cir. 2019) (rejecting a similar argument).

The second reason is that Defendants purportedly ignored the opinion and recommendation of Tartaro-McGowan's doctor. We find this argument unconvincing.

In his first note, Tartaro-McGowan's doctor explained that her chronic arthritis did "not allow her to squat or get very low." J.A. 717. Opining that such movements are "often required when treating patients at home," her doctor requested that "she be employed in a different capacity which will not require her to bend her knees or otherwise put stress on her lower extremities." J.A. 717. But Tartaro-McGowan explicitly acknowledged during her deposition that she could perform many of the tasks often associated with field visits while sitting or standing, without the need for her to bend or put stress on her knees:

> Q: And you testified quite extensively here today that a lot of the duties out in the field can be met by either sitting, standing or doing one of those other tasks that are not prohibited by [your doctor], correct?
>
> A: Yes.

J.A. 242. And given that Tartaro-McGowan was allowed to screen visits and self-select assignments, there is no reason—at least not one that she has provided here—that she could not have selected only those field assignments that would have been limited to those specific tasks. The same goes for Tartaro-McGowan's stated concern about potential challenges presented by the layout of a patient's home: with the information available in

21

the patient's chart, Tartaro-McGown could have avoided those assignments presenting any such challenges.[6]

Nonetheless, she contends that even this arrangement would have been inadequate because of potential emergency or otherwise unexpected situations that *might* have arisen, which, given her physical limitations, she *might* not have been able to adequately address. This claim echoes Tartaro-McGowan's second doctor's note, in which her doctor stated that he didn't "think" the screening and self-selection option was "reasonable" because a patient's needs "can never be truly determined until she is at the home doing a proper nursing assessment." J.A. 718. And in Tartaro-McGowan's view, because Defendants did not accept her doctor's opinion, their accommodation was unreasonable. We cannot agree.

While a plaintiff's doctor's opinion regarding an accommodation should be considered by the employer, the ADA doesn't bind the employer to that opinion if the proposed accommodation is otherwise reasonable under the circumstances. *See Elledge*, 979 F.3d at 1011 (explaining that "what will serve as a reasonable accommodation in a particular situation may not have a single solution, but rather, many possible solutions," and that in such situations, "the employer, exercising sound judgment, possesses ultimate

---

[6] Interestingly, although Tartaro-McGowan identified the layout of a patient's home as a primary concern regarding her ability to perform *direct* patient care field visits, *see* J.A. 346, there's nothing in the record showing that she ever expressed any such concern when performing *supervisory* field visits, which likewise required her to travel to, enter, and navigate patients' homes. To the contrary, she specifically testified that when she performed supervisory field visits, she didn't know the layout of the patients' homes before entering and either "didn't think about" or didn't recall speaking with a clinician regarding the layout beforehand. J.A. 129, 149.

discretion over these alternatives" (cleaned up)). And the undisputed evidence here shows that was the case with respect to Defendants' proposed accommodation.

As just discussed, Defendants' proposed accommodation directly addressed the specific physical limitations identified by Tartaro-McGowan's doctor. Tartaro-McGowan herself admitted that there were many field duties that can be performed while sitting or standing, without the need to bend or squat. And she would have had the ability to screen and self-select those field assignments that would have been limited to such tasks.

In his second letter, Tartaro-McGowan's doctor did not note any additional restrictions or opine that Tartaro-McGowan would be unable to perform the types of tasks that did not require her to bend, squat, or kneel. Rather, he noted only a generalized concern regarding Tartaro-McGowan's inability to tell the future, to know with absolute certainty that no patient's needs would ever require the attending clinician to perform any of the physical functions that Tartaro-McGowan might have difficulty performing. But that logic rests on a slippery slope. Arguably, there is always *some* risk of an unexpected event occurring during a field visit that even a perfectly healthy and able field nurse might not be physically capable of addressing alone. But if a healthcare provider allowed that risk—no matter how remote—to completely shape its hiring decisions, it would have a near impossible task of finding qualified clinicians.

The ADA requires reasonableness, not perfection. Reasonableness does not demand that an accommodation have an airtight solution to every contingency conceivable. Its dictates are tethered to the practical realities of each case, not boundless hypotheticals. And the practical realities here were that (i) Inova Home Health had a severe shortage of

23

field nurses created by an unprecedented pandemic; (ii) patients needed to be seen; (iii) all internal staff were required to assist with direct patient care field visits as a result; (iv) there were several field duties that Tartaro-McGowan, an experienced field nurse, could perform within her physical limitations; and (v) by screening field assignments, Tartaro-McGowan had the ability to select those patients whose anticipated needs were compatible with her physical limitations. Given these practical realities, no reasonable jury could conclude that Defendants' accommodation was unreasonable.

Perhaps Tartaro-McGowan would have a stronger argument had she actually given Defendants' proposed accommodation a chance. If in practice it proved to be the case that unanticipated circumstances beyond Tartaro-McGowan's physical ability arose with such frequency as to effectively render Defendants' accommodation impracticable, she could have sought an alternative accommodation at that time. But having never tried to perform a direct patient care field visit using the accommodation made available to her, Tartaro-McGowan can offer only vague conjecture that Defendants' proposed solution was not viable. That is not enough to defeat summary judgment. *See Graves v. Lioi*, 930 F.3d 307, 324 (4th Cir. 2019) ("[S]urviving summary judgment . . . requires evidence, not unsupported conjecture.").[7]

---

[7] Moreover, even assuming Tartaro-McGowan would have on some occasion encountered unexpected patient needs incompatible with her physical ability, to suggest that she would have been entirely helpless to provide care in those circumstances is disingenuous. Even before her arthritic issues caused her to transition out of full-time field work and into the clinical manager position, there were instances in which she called 9-1-1 for emergency assistance or asked a family member of the patient to step in and assist. Tartaro-McGowan hasn't shown why she could not have done so again, or even have called
(Continued)

* * * *

Given the extraordinary circumstances facing Defendants at the time as a result of a nationwide pandemic, coupled with their "ultimate discretion" in selecting between alternative accommodations and Tartaro-McGowan's failure of proof as to the alleged inadequacy of the accommodation Defendants actually selected, no reasonable jury could conclude that Defendants' proposed accommodation was unreasonable. It may be, of course, that there was another reasonable solution Defendants could have offered (though Tartaro-McGowan has yet to identify one). But that in no way detracts from the reasonableness of the solution Defendants ultimately chose, a solution that Tartaro-McGowan steadfastly refused to entertain or even counter.

Because Tartaro-McGowan has failed to demonstrate that Defendants refused her a reasonable accommodation, "an essential element of [her prima facie] case with respect to which [she] has the burden of proof," *Bowen*, 84 F.4th at 172 (citation omitted), we affirm the district court's summary judgment award to Defendants on her failure-to-accommodate claim. In doing so, we emphasize that this case presents a unique set of facts involving the real-time and devastating impact of COVID-19. Therefore, our decision should be read in

---

another Inova Home Health staff member for assistance, in the appropriate circumstances. *See* J.A. 502 (VanZant testifying that Tartaro-McGowan could have asked Inova Home Health for assistance or reassignment if she were to have been physically unable to meet a patient's unanticipated need). While the availability of these options may not have alleviated each and every potential concern, the lodestar is *reasonableness*, and Defendants' proposed accommodation was reasonable under the circumstances.

25

its proper context, as future courts must evaluate each case based on its own particular circumstances. Having done that here, we discern no error by the district court.

B.

Considering our holding that Defendants offered Tartaro-McGowan a reasonable accommodation, which she refused, we readily dispose of her remaining discrimination and retaliation claims.

1.

Beginning with her discrimination claim, to survive summary judgment, Tartaro-McGowan is required to first establish a prima facie case, which requires proof that (i) she was a qualified individual with a disability; (ii) she was discharged; (iii) she was fulfilling her employer's legitimate expectations at the time of discharge; and (iv) the circumstances of her discharge raise a reasonable inference of unlawful discrimination. *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272 n.9 (4th Cir. 2004).

At a minimum, Tartaro-McGowan cannot prove the third and fourth elements.

As to the third element, there can be no dispute that, at the time of discharge, McGowan was not fulfilling Inova Home Health's legitimate expectations. As a result of the pandemic and corresponding nursing shortage, Inova Home Health required all internal staff members, including clinical managers like Tartaro-McGowan, to assist with direct patient care field visits. Tartaro-McGowan refused, even after being offered a reasonable accommodation and being asked to propose an alternative accommodation (which she failed to do). Following multiple warnings and a good-faith effort by Defendants to work with Tartaro-McGowan to find common ground, she still failed to perform any direct

26

patient care field visits by Defendants' specified date, resulting in her discharge from Inova Home Health.[8] No reasonable jury could believe, therefore, that Tartaro-McGowan was meeting her employer's legitimate expectations.

As to the fourth element, Tartaro-McGowan has not shown any circumstances raising an inference of unlawful discrimination, which is independently fatal to her prima facie case. As detailed above, Defendants offered Tartaro-McGowan a reasonable accommodation and otherwise signaled a willingness to negotiate with her regarding her performance of direct patient care field visits. But she refused and was subsequently terminated. And she wasn't the only similarly situated employee subject to termination: another internal staff member failed to perform a single direct patient care field visit, and she too was fired.[9] These are the circumstances surrounding Tartaro-McGowan's

---

[8] Tartaro-McGowan points out that she was scheduled to perform a direct patient care field visit on June 24 and that the only reason she didn't was because the patient's spouse rescheduled the visit. But she also admitted that she made no effort to find a replacement field assignment despite having been given a June 24 deadline to perform a direct patient care field visit. And in fact, the only reasonable inference from the record is that Tartaro-McGowan would have had a number of opportunities to perform a direct patient care field visit well before the June 24 deadline. Accordingly, any suggestion that Tartaro-McGowan was not to blame for her failure to complete any direct patient care field visits before the deadline is belied by the record.

[9] Tartaro-McGowan says in her brief that this other fired internal staff member was also disabled, but she provides *no* record support for that assertion. She further notes that two other, non-disabled internal staff members also had yet to perform any direct patient care field visits when she was fired. But she has provided no evidence that either of these other staff members communicated an outright refusal to perform such visits as Tartaro-McGowan had done. What's more, Tartaro-McGowan's counsel specifically acknowledged at oral argument that both staff members did, in fact, subsequently perform direct patient care field visits. They are therefore not similarly situated to Tartaro-McGowan.

27

termination. No reasonable inference of unlawful discrimination can be drawn from them. Accordingly, Tartaro-McGowan fails to satisfy the fourth element of her prima facie case.

Tartaro-McGowan's inability to establish all the elements of her prima facie case is fatal to her discrimination claim. We therefore affirm the district court's judgment in that respect.

2.

As to Tartaro-McGowan's retaliation claim, the district court found that Tartaro-McGowan had presented sufficient evidence to make out a prima facie case,[10] noting the "relatively short time period between" her request for an accommodation in mid-May 2020 and her termination in late June. *Tartaro-McGowan*, 2022 WL 2232190, at *10. But applying the *McDonnell Douglas*[11] burden-shifting framework, the district court then determined that Defendants had sufficiently articulated a legitimate, non-retaliatory reason for terminating Tartaro-McGowan and that she failed to show that this proffered justification was pretextual. We agree.

Assuming, without deciding, that Tartaro-McGowan established a prima facie case of retaliation, Defendants have undoubtedly provided a legitimate, non-retaliatory reason

---

[10] The elements of a prima facie case for retaliation under the ADA are (i) the plaintiff engaged in ADA-protected activity; (ii) she later suffered an adverse employment action; and (iii) there is a causal link between the two. *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002).

[11] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

for Tartaro-McGowan's termination: her failure to perform any direct patient care field visits, even with a reasonable accommodation, despite multiple warnings.

Hence, Tartaro-McGowan's claim can survive summary judgment only if she forecasts sufficient evidence that would allow a jury to reasonably infer that Defendants' stated justification was pretextual. *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 575–76 (4th Cir. 2015). She has failed to do so. We have already discussed at length the undisputed facts surrounding Tartaro-McGowan's termination, and we need not repeat them here. Rather, it is sufficient to say that our review of the record reveals that no reasonable jury could find that Tartaro-McGowan was terminated for any reason other than her refusal to perform direct patient care field visits despite being offered a reasonable accommodation and failing to engage with Defendants concerning an alternative accommodation. We have considered Tartaro-McGowan's arguments to the contrary and find them to be unsupported by or misrepresentative of the record. We therefore affirm the district court's judgment on this claim as well.

## IV.

For the reasons explained above, the district court did not err in granting summary judgment to Defendants on all of Tartaro-McGowan's claims. Accordingly, we affirm.

*AFFIRMED*

29